[Wright's Heirs *v.* Ware.]

# Wright's Heirs *v.* Ware.

*Bill in Equity for Injunction of Action of Ejectment, and Divestiture of Legal Title to Land.*

1. *Constitutionality of private legislative act, removing administration of decedent's estate from county of his residence.* — A private act of the legislature, removing the administration of a decedent's estate from the county of his residence at the time of his death, to another specified county, is not violative of any constitutional provision.

2. *Sale of decedent's lands for payment of debts; sufficiency of petition in averring necessity for sale.* — When the administrator's petition, asking a sale of his intestate's lands for the payment of debts (Code of 1852, § 1755), alleges that the estate "is involved in debts, and a sale of some portion of said estate is necessary for the purpose of paying debts, and, in the opinion of your petitioner, it will be more beneficial for the estate that the above land should be sold, for the purpose of paying debts, than slaves," — these averments will be held sufficient to sustain the jurisdiction of the court, when the sale is collaterally impeached, in a controversy between the purchaser and the heirs-at-law of the intestate.

3. *Same; description of lands in petition.* — "*Section* 12, *T.* 17, *R.* 21," as used in describing the lands in the administrator's petition, though defective as matter of pleading, are sufficient to sustain the sale, when collaterally assailed; and if the order of sale shows that the lands are situated in the county, although that fact is not averred in the petition, this will be sufficient to sustain the jurisdiction of the court.

4. *Same; proof "by depositions as in chancery cases."* — When the recitals of the record show, that a commission was ordered to be issued to two persons by name, "to take the testimony in this cause, and report the same to the court on" a specified day; and that said commissioners "returned the same to the court, which, by order of the court, is opened, read, and ordered of file among the papers in the cause;" and that "the court proceeding to examine the testimony taken in the cause, from which it appears that it will be more for the benefit of the estate that the said lands should be sold than slaves;" these recitals will be sufficient, when the sale is collaterally assailed, to show that proof of the necessity for the sale was "taken by deposition as in chancery cases."

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. ADAM C. FELDER.

The bill in this case was filed on the 1st day of April, 1870, by Robert Y. Ware and the children and heirs-at-law of James H. Ware, deceased, against Evalina Wright and others, who were the heirs-at-law of William C. Wright, deceased; and sought to restrain and enjoin the further prosecution of an action of ejectment, which the defendants had instituted to recover the possession of a certain tract of land, which had belonged to said William C. Wright at the time of his death, and which the complainants held and claimed under a purchase at a sale made by his administrator, under an order and decree of the probate court of Montgomery, as hereinafter more particularly stated. Said William C. Wright died in 1853, or 1854, in Tallapoosa county, where he resided, near the boundary line between that county and Montgomery; and his plantation, on which he resided, consisted of lands lying in both of said counties. On the 11th February, 1854, a special act of the legislature was passed, removing the administration of his estate

from Tallapoosa to Montgomery county. This act was entitled " An act to authorize the probate court of Montgomery to take jurisdiction of the estate of William C. Wright, deceased," and was in these words : " *Section* 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama, in general assembly convened,* That the probate court of Montgomery county shall take jurisdiction of the estate of William C. Wright, who recently died in the county of Tallapoosa, and shall grant letters of administration, and perform all other acts relating to said estate, as fully and completely as if the said Wright had been a resident citizen of Montgomery county at the time of his death." Session Acts, 1853–4, p. 77.

Acting under the authority conferred by this statute, the probate court of Montgomery, on the 14th of February, 1854, granted letters of administration on the estate of said William C. Wright to James Abercrombie, who duly qualified, and gave bond. On the 20th February, 1854, said Abercrombie filed in said probate court of Montgomery his petition in writing, and under oath, asking an order to sell said intestate's lands for the payment of debts. The material parts of said petition are as follows : " Your petitioner, who is the administrator of all and singular the goods and chattels, rights and credits, which were of William C. Wright, deceased, late of the county of Tallapoosa, would respectfully represent, that the said deceased died seized and possessed of the following real estate, to wit, *Section* 12, *T.* 17, *R.* 21, containing six hundred and forty acres," and other lands ; " that the estate of the said W. C. Wright is involved in debts, and a sale of some portion of said estate is necessary for the purpose of paying debts, and, in the opinion of your petitioner, it will be more beneficial for the estate of the said deceased that the above land should be sold, for the purpose of paying debts, than slaves. Your petitioner therefore prays your honor to grant him an order of sale, to sell the lands above described, for the purpose of paying the debts due and owing by the said William C. Wright, deceased. Your petitioner further shows, that the said deceased left, as his heirs-at-law, the following named persons," specifying their names, ages, and residence, and showing that the children were all minors.

On the filing of this petition, the court appointed the 6th day of April, then next ensuing, for the hearing ; ordered notice thereof to be given, by publication, for three successive weeks ; appointed a guardian *ad litem* for the minor heirs, and ordered notice to be issued to him. On the 6th April, the cause was continued until the 7th day of June ; and on that day it was again continued, until the 27th day of June ; and it was ordered " that a commission issue to Daniel H. Work-

[Wright's Heirs *v.* Ware.]

man and Samuel D. Hubbard, to take testimony in this cause, and that they report the same to this court, on or before the 27th day of June, 1854." On the 27th day of June, 1854, the court rendered the following decree : " The cause of the application of James Abercrombie, administrator of William C. Wright, deceased (wherein he prays for an order of sale, to sell certain lands, named in his petition, for the purpose of paying debts due and owing by the said deceased), coming on for a hearing ; and it appearing at the court that notice of his application has been given, by publication for more than three successive weeks in the *Alabama Journal*, a newspaper published in the county of Montgomery, notifying all persons interested to be and appear at a court to be held on the 6th day of April, A. D. 1854, to show cause why said land should not be ordered to be sold ; and the commissioners heretofore appointed to take the testimony in this cause having returned the same to the court, which, by order of the court, is opened, read, and ordered of file among the papers in this cause ; and Henry Peebles, guardian *ad litem* for William Wright, Sarah Wright, Evalina Wright, Edwin Wright, Mary Wright, and Charles Wright, minor children of the deceased, coming into open court, denies in writing the allegations set forth in the petition of the administrator ; and the court proceeding to examine the testimony taken in the cause, from which it appears to the court that it will be more for the benefit of the estate of the said William C. Wright, deceased, that said land should be sold than slaves ; it is therefore ordered, adjudged, and decreed by the court, that James Abercrombie, administrator of the estate of William C. Wright, deceased, first giving notice of the time and place of sale, by publication for three successive weeks in some newspaper published in the county of Montgomery and Tallapoosa, proceed to sell the following described lands, to wit : *Section* 12, *T.* 17, *R.* 21 ; also," the other lands named in the petition ; " said lands to be sold on the following credits, to wit, one third due the 1st April, 1855, one third the 1st January, 1856, and one third the 1st January, 1857, the two last payments drawing interest from the 1st January, 1855 ; except the residence and mill tract in Tallapoosa county, which will be sold one half due January, 1855, and half due January, 1856 ; the land in Tallapoosa county to be sold at the late residence of the deceased, and the land in Montgomery county to be sold at the court-house door of the county ; purchasers giving notes, with two good and approved securities. And ordered, said administrator return an account of land sale to this court, in sixty days."

The lands were sold, under this order, on the first Monday in December, 1854 ; and the sale was reported to the said pro-

bate court, in July, 1855 ; and at a special term of said court, held on the 7th day of July, 1855, the following decree was rendered : " This day came James Abercrombie, administrator of the estate of William C. Wright, deceased, and made his report in writing, and under oath, of the sales of certain real estate belonging to the said deceased, lying in the counties of Tallapoosa and Montgomery ; and from said report it appears, that said administrator, having first given notice of the time and place of sale, by publication for three successive weeks," &c., proceeded to sell the lands lying in Tallapoosa county, which are not in controversy in this case ; " and from said report it further appears, that said administrator, having first given notice of the time and place of sale, by publication for three successive weeks in the *Alabama Journal*, a newspaper published in Montgomery county, did proceed to sell before the court-house door in the city of Montgomery, on the 4th day of December, 1854, at public sale, the following lands, lying and being in the county of Montgomery ; at which said sale, Robert Y. Ware became the highest and best bidder for said lands, to wit, *Section* 12, *T.* 17, *R.* 21, containing *seven* hundred and fifty-four acres, at the price of $30.50 per acre, amounting in the whole to the sum of $19,947 ; and that he has complied with the terms of said sale, by executing his three promissory notes, each for the sum of $6,649, — one due the 1st April, 1855 ; the second due the 1st day of January, 1856, and the third due the 1st day of January, 1857, all bearing interest from the 1st day of January, 1855, with James H. Ware and Robert J. Ware as his securities, — all of which is approved and confirmed by the court ; and it is ordered, adjudged, and decreed by the court, that James Abercrombie, administrator as aforesaid, after the parties above named shall have fully paid the purchase-money for the respective lands purchased by them at said sales, as above described, proceed to convey and set over to them, their heirs, and assigns, all the right, title, and interest, or estate, that the said William C. Wright, deceased, had or held at the time of his death ; and ordered, that said report be recorded."

The administrator gave a certificate of purchase to the said Robert Y. Ware, in which the lands were described as " *Section* 12, *T.* 17, *R.* 21, Tallapoosa land district, county of Montgomery ; " and full payment of the purchase-money was made, as the notes fell due ; but the administrator died without having executed a conveyance to the purchaser. After this, but at what precise time the record does not show, the heirs-at-law of said W. C. Wright brought an action of ejectment against the said Robert Y. Ware, to recover the possession of the said lands above described ; and thereupon the bill in this case was

[Wright's Heirs *v.* Ware.]

filed, to enjoin the further prosecution of said action at law, and to compel a divestiture of the legal title to said lands out of the said heirs-at-law. The bill alleged, in addition to the facts above stated, that James H. Ware, since deceased, was jointly and equally interested with said Robert Y. Ware in the purchase of said lands, though the name of said Robert Y. Ware was returned as the sole purchaser; that the price paid for said lands at said administrator's sale was in excess of the real value of the lands; that notwithstanding any mistake, or inaccuracy of description, in the petition for the sale, or in the proceedings connected with the sale, the lands sold were the lands intended to be sold, and were situated in the county of Montgomery; and that the purchase-money received by the administrator was used and applied by him in the due course of administration. A transcript of the proceedings had in the probate court of Montgomery in connection with the sale, showing the facts above stated, was made an exhibit to the bill.

The adult defendants answered the bill, admitting the material facts, as above stated, but denying the validity of the administrator's sale; and they incorporated in their answer a demurrer to the bill, specifying the following causes of demurrer: 1st, that the bill is without equity; 2d, that the complainants have an adequate remedy at law on the facts stated in the bill; 3d, that the bill shows that James Abercrombie never was the administrator of said William C. Wright; 4th, that the grant of administration on the estate of said Wright by the probate court of Montgomery is void; and, 5th, that no title, legal or equitable, to the lands described in the bill, passed to the complainants by the proceedings had under the alleged order of sale. A formal answer was filed by the guardian *ad litem* of the infant defendants, denying the allegations of the bill, and demanding proof. The chancellor overruled the demurrer, and, on final hearing, on pleadings and proof, rendered a decree for the complainants.

The final decree, and the overruling of the demurrer to the bill, are now assigned as error.

RICE, CHILTON & JONES, for the appellants.

BRAGG & THORINGTON, *contra.*

BRICKELL, J.— A material question, pressed for our consideration, by the argument of the counsel for appellants, is the constitutionality of the special statute, by which the administration of the estate of William C. Wright, deceased, was transferred from the court of probate of Tallapoosa, the county of his residence at the time of his death, to the court of probate of

the county of Montgomery. In the enactment of this statute, the legislature did not exercise judicial power. Though the interests and necessities of those having rights in the estate and its administration may have demanded it, there was no court in the State clothed with jurisdiction to order and adjudge the transfer. There was no controversy pending, or which could arise, determined or affected by the statute. No disputed fact is ascertained, or declared; no right of property, or right springing out of contract, is impaired. The order prescribed for the grant of administration is not changed. The qualifications the administrator must possess, and the conditions on which an appointment can be made, remain as defined by the general law. The statute simply transfers jurisdiction of a particular administration, from one court to another of coördinate and coëqual jurisdiction, so far as the subject-matter is involved. The court to which the transfer was made is bound, in the exercise of its jurisdiction, to observe the same laws which were obligatory on the court from which the transfer is made. The enactment of the statute cannot, then, be considered the usurpation by the legislature of judicial power; nor a deprivation of property without due course of law.

The 9th section of the 5th article of the constitution of 1819, operative when this statute was passed, declared: " The general assembly shall have power to establish, in each county within this State, a court of probate, for the granting of letters testamentary and of administration, and for orphans' business." It is now insisted, that " this section of the constitution made it impossible for the legislature to take away from any probate court it might thereunder establish, any jurisdiction which this section of the constitution had assigned to such court, as soon as so established." If this proposition as stated were conceded, we do not see how it would affect the question here presented. The jurisdiction conferred by the constitution on the court of probate is the granting of letters testamentary and of administration, and for orphans' business. This constitutional jurisdiction is exclusive in the court of probate; and the exercise of such jurisdiction by any other court, after the legislature established courts of probate, is impliedly inhibited. The grant of jurisdiction, by the constitution, is as plenary to one court of probate as to another. The constitution does not assume to prescribe the cases, nor the territorial limits, within which particular courts of probate shall exercise this jurisdiction. Under the constitutional grant, the jurisdiction of no one court of probate is exclusive of that of another. So far as dependent on the constitution, all courts of probate are of concurrent jurisdiction. The cases, and the territorial limits, within which this jurisdiction is to be exercised, and to become exclusive, are of

[Wright's Heirs v. Ware.]

legislative creation; while the jurisdiction itself is derived from the constitution. Hence it is that, in the classification of jurisdictions, as to a grant of letters testamentary or of administration, the court of probate is not esteemed as a court of limited, or statutory, but of general jurisdiction. *Ikelheimer* v. *Chapman*, 32 Ala. 676; *Gray* v. *Cruise*, 36 Ala. 559; *Coltart* v. *Allen*, 40 Ala. 155.

If the legislature, in establishing courts of probate, had simply declared, in the language of the constitution, that there was established in each county within this State a court of probate, for the granting of letters testamentary and of administration, and for orphans' business, not declaring and defining the cases in which administration could be granted by each of the courts, nor confining them, in the exercise of their jurisdiction, to prescribed territorial limits; could it be said, that thereby the jurisdiction of each court was circumscribed to the county of its location, and was there exclusive? that the constitution, irrevocably and immutably, without regard to the convenience, necessity, and interest of the citizen, committed to the court of the county of the residence of the decedent exclusive jurisdiction of the administration of his estate? We think it manifest, if the statute establishing courts of probate had simply pursued the language of the constitution, the jurisdiction of each court, not only as to the subject-matter, but as to the cases in which it could be exercised, would have been concurrent, and coextensive with the limits of the State. Then, the limitation as to the cases, territorial limits, and the mode in which this constitutional jurisdiction shall be exercised, are of legislative creation, and capable of enlargment or diminution, at the will of the legislature. No right of the citizen is invaded, because he is by a subsequent law committed to a jurisdiction of equal dignity and authority, for the hearing and determining of his controversies, compelled to observe and administer in the same mode the same laws as the tribunal having jurisdiction when the right accrued, or the controversy arose.

The general principle on which this, and all state courts, proceed, is that the grant of legislative power, by the state constitution, is a general grant of all the legislative power residing in the people as a sovereign community, subject only to such limitations as are expressed in the constitution of the State, or in the federal constitution. *Ex parte Dorsey*, 7 Port. 293; *Dorman* v. *State*, 34 Ala. 216. A state constitution, indeed, properly speaking, is not a grant of power, but an instrument of restraint and limitation upon power already plenary, so far as it respects the functions of government, and the objects of legislation. *State* v. *Reid*, 1 Ala. 612; *Dorman* v. *State*, supra; *Stein* v. *Mayor*, &c. 24 Ala. 391; *Alabama & Florida*

[Wright's Heirs *v.* Ware.]

*R. R. Co.* v. *Burkett*, 42 Ala. 83. When power is exercised by the legislature of a state, the inquiry is, what limitation or restraint on its power, imposed by the constitution, state or federal, has been transcended. If he who objects cannot make it clearly appear that these limitations or restraints have been transcended, courts cannot interfere; their only duty then is obedience to the mandate of the legislative power. We cannot see that the legislature, in the passage of the statute in question, transcended any limitation of its power; and we are bound to affirm the constitutionality of its enactment.

The frequent enactment of similar statutes, the recognition of their validity by every department of the government, and the magnitude of the interests which must rest on their hitherto unquestioned validity, would compel us, if we doubted, to affirm the constitutionality of the enactment. For, though it may not be true in all cases, it is certainly true when a statute conforms to a long-continued recognition and acquiescence of every department of the government; when private rights have grown up and multiplied upon this recognition, for courts " to doubt is to be resolved " in favor of its conformity to the constitution.

It is objected that this is a special statute, exempting a particular administration from the operation of the general law, and is, therefore, unconstitutional. There was no prohibition in the constitution of 1819, against special legislation. It depended for its validity on the same principles pertaining to general legislation. If it interfered with no private right, did not disturb past transactions, and was not usurpation by the legislature of power committed to some other department of the government, it was not an objection that the operation of a legislative enactment was removed to one, or a few individuals, only.

The argument that, if this special statute can be maintained, it will be within legislative competency, by similar statutes, to divest the whole jurisdiction of the court of probate of Tallapoosa county, and concentrate it in the court of probate of the county of Montgomery, seems to us more specious than solid. In answer to a similar argument pressed on this court, it has been said: " It is sufficient to say, that the general assembly has not in fact done what it is suggested it may hereafter do. We are here to decide actual, not possible cases. All that we can, or ought to do, is to determine whether this particular law is constitutional. We are certainly not prepared to hold that a legislature shall not exercise a constitutional power, because some succeeding general assembly may exercise it beyond the proper limits. That would be to say, that a lawful power must not be used at all, because it may be abused." *Dorman* v. *State*, 34 Ala. 245; *State* v. *Reid*, 1 Ala. 612. It is not a just or reasonable presumption, that the legislature will ever pass

[Wright's Heirs *v.* Ware.]

enactments similar to this, except for the very purpose which the constitution proposes to accomplish in ordaining the establishment in each county of a court of probate, — the convenience of the citizen. Cases will arise in which this convenience will be promoted by the transfer of an administration from the court of probate to which the general law commits it, to another. When they do arise, the legislature will, doubtless, wisely exercise the power the constitution does not restrain, or prohibit them from exercising. The matter is intrusted to legislative power and discretion, and it is not for courts to indulge jealousy of its exercise. The result we reach is, that this special statute clothed the court of probate of Montgomery county with its full constitutional and statutory jurisdiction, as to the administration of the estate of William C. Wright, deceased, the ancestor of appellants.

2. It is urged, that if the court of probate had jurisdiction of the administration, its jurisdiction to order a sale of the lands of the intestate is statutory, and the record of its proceedings does not disclose the existence of the facts which call into exercise this jurisdiction. The statute under which the proceedings were had is section 1755 of the Code of 1852, which is in these words: " In cases of intestacy, lands may be sold by the administrator for the payment of debts: 1. When the personal property is insufficient therefor. 2. When it is more beneficial for the estate to sell lands than slaves." The averments of the petition, or application, on which the order of sale in this case is predicated, are " that the estate of said William C. Wright, deceased, is involved in debts, and a sale of some portion of said estate is necessary for the purpose of paying debts, *and, in the opinion* of your petitioner, it will be more beneficial for the estate of said deceased that the above land should be sold for the purpose of paying debts, than slaves." The prayer of the petition is for an order " to sell the lands above described, for the purpose of paying debts due and owing by the said William C. Wright, deceased."

As matter of pleading, these averments are wholly insufficient. They are not clear, distinct allegations of the facts, on the existence of which depends the right to the decree sought. If the sufficiency of the petition had been put in issue by demurrer, or assailed on error, judgment against it must have been pronounced. Then, as has been said in this court, all intendments would have been indulged against the pleader. When the proceedings ripen into a decree, and are collaterally assailed, and rights of property have attached, the rule is changed, and every reasonable intendment is made in favor of the validity of the decree. All questions of pleading, which the court had the right to decide, are conclusively adjudicated, and

whether correctly or not, is not the subject of inquiry. *King* v. *Kent*, 29 Ala. 542; *De Bardelaben* v. *Stondenmire*, January term, 1872; *Thompson* v. *Zolvine*, 2 Peters, 157. If the petition had pursued the precise language of the statute, and averred that it was "more beneficial to the estate to sell lands than slaves," its sufficiency could not have been questioned on error or on demurrer. That averment would have been, at last, rather a conclusion from facts, than a fact itself. It would have been but a positive expression of the belief and opinion of the petitioner, growing out of his knowledge of the property to be sold, and that which was to be exempted from sale, and whether the sale of the one, and the exemption of the other, was most conducive to the interests of those entitled to succeed to the estate. A delicately conscientious pleader might hesitate to aver this conclusion, without expressing it as matter of opinion only. Reading the petition, as it was doubtless read by the court of probate, and intended by the petitioner to be read, it must now be considered as averring the conviction of the petitioner that a sale of the lands was more beneficial than slaves; and thus read, it fully supports the jurisdiction exercised by the court of probate. This is but a just application of the rule, which requires every reasonable presumption to be indulged in favor of the regularity of the sentence of a court of competent jurisdiction, when it is collaterally assailed; a rule as applicable to the sentences of inferior, as to the sentences of superior courts. *Wyman* v. *Campbell*, 6 Port. 219; *Duval* v. *McLoskey*, 1 Ala. 708.

3. It is next insisted, that the application for sale conferred no jurisdiction on the court of probate to make the order of sale, as to the lands in controversy, "in that there was no sufficient description of said land in the said application." The lands in controversy are described in the application for sale as, "*Section* 12, T. 17, R. 21, containing six hundred and forty acres." If the question now was one of pleading, we would be compelled to declare that this was not a sufficient description of the land. The lands should be described with sufficient particularity to inform the court and purchasers what particular lands are intended to be sold. *Lory* v. *Pace*, 42 Ala. 495. But, as we have already said, the question presented is not now one of pleading. The rules prevailing when the sufficiency of pleading are to be passed upon, are essentially different from the rules prevailing when a court is called upon to condemn a solemn judicial proceeding, which has stood until an appeal from it is barred by the lapse of time, and which has become the foundation of title to property. The sufficiency of this description was matter of objection in the court of probate. If objection had been there interposed, and sustained, an amend-

ment would have cured the defect. An amendable defect of this character, we cannot believe, will ever justify a sentence of nullity against judicial proceedings, when collaterally assailed. If, because of this imperfect description of the lands, the order of sale had been by appeal brought before this court for revision, the judgment pronounced would have been a reversal of the decree, and a remandment of the cause for further proceedings. Now, if we should hold the order of sale void, the judgment is one of absolute nullity. The statute, it is true, requires that the application should "describe the lands accurately." But it also requires that it should state the names of the heirs, or devisees, and their places of residence, and if any, which are under age, or married women, or of unsound mind. Code of 1852, § 1868. This was a substantial reënactment of the statute of 1822. Clay's Dig. 224, § 16. Under the statute of 1822, it was well settled that an omission to state the names of the heirs, their ages, &c., was a mere irregularity, not vitiating the decree, when collaterally assailed. *Field* v. *Goldsby*, 28 Ala. 218 ; *Saltonstall* v. *Riley*, Ib. 164 ; *Duval* v. *McLoskey*, 1 Ala. 708. The same rule should be applied, when the decree is assailed because of an inaccurate or imperfect description of the lands. If inaccuracy, or imperfection of description of the lands, could be held to vitiate the proceedings, then the inquiry would at once arise, what degree of inaccuracy will subject them to condemnation ? How gross must it be, or what imperfections are so slight that they may be disregarded ? When will validity or invalidity be imputed ? Vagueness of description, or mistakes, so that lands are entirely misdescribed, do not avoid a deed or grant. They are subject to correction, and parol evidence is received to identify the lands intended to be described. Indefiniteness and discrepancies in the description of lands, in the petition, order of sale, report of sale, and conveyance of title, it has been expressly decided, do not invalidate the sale, and parol evidence is admissible to fix the boundaries of the lands ordered to be sold, and intended to be sold. *Saltonstall* v. *Riley*, 28 Ala. 164.

The act of February 9, 1852, now incorporated into, and forming section 2128 of the Revised Code, provides a speedy and summary remedy, in the court of probate, for correcting mistakes in the description of lands sold under the orders and decrees of that court. This we regard as declaratory of a legislative intent that such mistakes shall not operate the invalidity of the sale. The evidence in this case is full and uncontroverted, that the lands ordered to be sold, and sold, were the lands in controversy. The sale has been followed by peaceable and uninterrupted possession by the purchasers for near fourteen years. The purchase-money was paid, and received by the adminis-

trator, he and the purchasers resting on the belief that the lands, the possession of which had been transferred on the sale, were the lands ordered to be sold, and which were in fact sold. The purchasers acquired under the sale a title not now to be disputed or disturbed, because the lands may have been inaccurately described in the proceedings for sale ; a title which a court of equity may well protect, by divesting the heirs of any title by descent they may prefer, and by restraining them from prosecuting any legal remedies for the recovery of the lands.

The objection, that it does not appear that the lands sold were situate within the jurisdiction of the court, if of any force, is not sustained by the record. The order of sale expressly directs the administrator to sell such of the lands as lie in Tallapoosa county, at the late residence of the intestate, in that county, and such of the lands as lie in Montgomery county, at the door of the court-house, of that county. This we regard as affirming that the lands ordered to be sold are within those two counties.

4. It is next insisted, that the decree of sale is void, because the record does not disclose that in the court of probate proof was taken by depositions, as in chancery cases, showing the necessity for the sale. The statutes prior to the act of February 7, 1854, required that the necessity of sale, averred in the application, should be proved by depositions, taken as in chancery cases. When the validity of the decree was impeached on error, the record must have shown affirmatively that the necessity for sale was proven to the court, by depositions taken as in chancery cases. An affirmation that the evidence was taken by " interrogatory," would not support the decree. *Hill* v. *Hill*, 9 Ala. 793. If the decree was collaterally impeached, the absence of affirmation in the record that the necessity for sale was shown by deposition, taken in the prescribed mode, was deemed a mere irregularity, not affecting the validity of the decree. *Field* v. *Goldsby*, 28 Ala. 218. The act of February 7, 1854, now forming sections 2224–5 of the Revised Code, as construed in *Satcher* v. *Satcher* (41 Ala. 26), declares the order of sale void, unless the probate court has taken proof by deposition, as in chancery proceedings, showing the necessity of sale, when minors or persons of unsound mind are interested. The operation of this statute is to convert that which was regarded as matter of direction, and the failure to disclose in the record an observance thereof a mere error or irregularity, into matter of jurisdiction.

Testing the recitals of this record by the presumptions extended to judicial proceedings, when collaterally drawn in question, we feel justified in declaring, that it appears from the record that depositions, proving the necessity of sale, were taken

[Mead v. Christian.]

as in chancery proceedings. It is not necessary the record should declare, in express terms, that the depositions were so taken. If its recitals, fairly interpreted, lead to the conclusion that they were so taken, the requirements of the law are satisfied. It appears here that depositions were taken, — that they were taken under a commission, addressed to two persons by the court appointed as commissioners ; that they reported the evidence to the court ; that the court ordered it to be published and filed. There are but two modes of taking depositions, known to our law, — one in proceedings at common law, and one in proceedings in chancery. The recitals of this record are as consistent with the hypothesis that the depositions were taken as in chancery proceedings, as that they were taken as in proceedings at common law. This being true, we must adopt that hypothesis which will support and preserve, not that which will invalidate the proceedings.

Our conclusion is, the decree of the chancellor was correct, and it is affirmed.